UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------- x

SARAH LIPKIN,                                    :
                                                 :
                        Plaintiff,               :
                                                 :
            v.                                   :        23-CV-127 (SFR)
                                                 :
VELMA GEORGE,                                    :
                                                 :
                        Defendant.               :
----------------------------------------------------------------- x

**MEMORANDUM & ORDER**

Plaintiff Sarah Lipkin worked as an Advanced Practice Registered Nurse for Cornell-Scott Hill Health Corporation ("CS-HHC") from 2021 to 2022. Lipkin's responsibilities included providing medical care to people at homeless shelters and warming centers in the City of New Haven (the "City"). On the morning of March 29, 2022, Lipkin met with Defendant Velma George, the City's Coordinator for Homelessness, to discuss one of Lipkin's patients. Although accounts of the conversation differ markedly, it is clear that Lipkin and George had a disagreement. After the meeting, George wrote to Lipkin's supervisors to express her "concern[] about [Lipikin's] ability to serve our clients with dignity" and "ability to work collaboratively with partner agencies." CS-HHC later invoked George's concerns as the basis for not renewing Lipkin's contract for cause.

Lipkin asserts that George retaliated against Lipkin in violation of the First Amendment and committed the common law torts of defamation *per se* and interference with contractual relations by deliberately misrepresenting Lipkin's professional skills to Lipkin's supervisors. At the close of discovery, George moved for summary judgment on all three claims. For the reasons stated below, I deny George's Motion for Summary Judgment on all claims.

1

## I.    BACKGROUND

### A.    Factual Background

The following facts are taken from the parties' Local Rule 56 statements and the underlying evidentiary record and are uncontested unless otherwise stated.[1]

#### 1.    Services for New Haven's Homeless Population

Lipkin was hired by CS-HHC to work as an Advanced Practice Registered Nurse ("APRN"). Pl.'s L.R. 56(a)2 St. of Mat. Facts in Dispute ("Pl.'s L.R. 56(a)2 St.") ¶ 1, ECF No. 93.[2] They[3] were hired by CS-HHC on a one-year renewable contract lasting from May 2021 to May 2022. *Id.* ¶¶ 40-41. Lipkin's responsibilities included providing medical care to homeless people living on the streets, in shelters, and at warming centers. Lipkin Dep., ECF No. 87-3, at 12. CS-HHC partnered with the City of New Haven to provide medical services to New Haven's homeless population. ECF No. 107, at 1.

At all times relevant to this action, George served as Coordinator for Homelessness for the City of New Haven. Pl.'s L.R. 56(a)2 St. ¶ 3. George's responsibilities included "developing and implementing programs with stakeholders" and "maintaining relationships with partners and stakeholders." *Id.* The City contracted with BHCare, which provided "case management, behavioral health, and counseling services to homeless individuals in the City of New Haven." *Id.* ¶ 4. The City funded BHCare to operate a warming center out of the New

---

[1] The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

[2] When Lipkin admits a fact stated in George's Local Rule 56(a)1 Statement, I cite only to Lipkin's Local Rule 56(a)2 Statement admitting that fact as true.

[3] Lipkin uses they/them pronouns. Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 1 n.1, ECF No. 94.

Haven Inn. *Id.* ¶¶ 7-8. This warming center permitted homeless people in New Haven to shelter indoors from the elements. George Dep., ECF No. 87-4, at 6-7.

### 2.    Events on March 29, 2022

On the morning of March 29, 2022, Lipkin conducted medical visits at a soup kitchen before proceeding to the warming center at the New Haven Inn. Pl.'s L.R. 56(a)2 St. ¶¶ 5-6. Lipkin was accompanied by Chloe Andree, a registered nurse also hired by CS-HHC. *Id.* ¶ 5. That morning, Lipkin was copied on a medical note from the Yale-New Haven Emergency Department, which reported that Lipkin's patient "RD" had been sexually assaulted and treated in the emergency room the previous evening. *Id.* ¶ 6. Lipkin had treated RD in the past because RD was living at the warming center at the New Haven Inn. Lipkin Dep., ECF No. 87-3, at 17. Lipkin and Andree proceeded to the New Haven Inn, where they spoke with "G," RD's partner. Pl.'s L.R. 56(a)2 St. ¶ 9. G told Lipkin and Andree that, in spite of RD's injuries, he and RD had been informed they would be discharged from the warming center the following day. *Id.* The couple was due to be discharged on March 30 because the City of New Haven had set an April 1 end date for paying for services at the New Haven Inn. *Id.* ¶ 10. G asked that Lipkin and Andree advocate on his and RD's behalf to identify some alternative discharge plan. *Id.* ¶ 12.

Lipkin and Andree sought out BHCare staff after speaking with G. *Id.* ¶¶ 12-15. Lipkin and Andree spoke with BHCare staff in an office. The parties agree that Lipkin, Andree, Bobbi-Jo Evans (Housing Outreach Program Manager for BHCare), Rogsbert King (another BHCare employee), a BHCare social worker, and Velma George were in the office at the time. *Id.* ¶ 16. Lipkin's goal was to learn about the substance of the discharge plan for RD and G and to ensure that RD received "adequate health care and was safe." *Id.* ¶ 13. After the BHCare social

worker confirmed that RD was due to be discharged the following day, *id.* ¶ 15, Lipkin told the BHCare social worker they were "disappointed with the discharge plan for the couple and that more had not been done to support RD," *id.* ¶ 17. After overhearing this remark, Bobbi-Jo Evans became upset and told Lipkin "that Lipkin did not understand how hard BHCare staff worked." *Id.* ¶¶ 17, 23. Evans remarked, "We can't do more for clients than they do for themselves." *Id.* ¶ 17. When Evans brought up the care needs of another client, "Lipkin accused [Evans] of yelling at them." *Id.* ¶ 27.

George then joined the conversation. George told Lipkin that Evans was not yelling at them. *Id.* ¶ 28. George stated to Lipkin: "You don't know what you are talking about." *Id.* ¶ 18. Lipkin in turn responded to George that Lipkin did know what they were talking about because Lipkin had been working with RD every week since August 2021. *Id.* ¶ 19. Lipkin also said to George that this was the first time that Lipkin had seen George at the warming center. *Id.* ¶ 20. Lipkin then stated that they would leave; George agreed that Lipkin should leave. *Id.* ¶ 22.

Although those basic details are not disputed, the parties have submitted divergent accounts of the tone, tenor, and additional content of this interaction. George supports her account with her own deposition testimony, as well as the deposition testimony of Rogsbert King.[4] Lipkin relies on their own deposition testimony, as well as the affidavit of Chloe Andree. Andree avers that BHCare staff responded defensively to Lipkin's respectful query as to the discharge plan for RD and G. Andree Aff., ECF No. 93-3, ¶¶ 17-19. Without raising

---

[4] Although Bobbi-Jo Evans participated in the conversation and was deposed in relation to this action, *see* ECF No. 87-11, the parties agree that, following an unrelated injury, Evans "does not recall the subject incident," Pl.'s L.R. 56(a)2 St. ¶ 37.

4

their voice, Lipkin responded "clearly and firmly" that Lipkin "would be disappointed if we could not provide some other arrangements for RD." *Id.* ¶ 20. BHCare staff quickly "became loud and began yelling," suggesting that Lipkin and Andree were unqualified to criticize BHCare's work. *Id.* ¶ 24. Andree recounts that Lipkin responded "in a normal tone and in a professional manner." *Id.* ¶ 29. When George and BHCare criticized Lipkin, Lipkin "expressed confusion about why people were yelling," and suggested that "perhaps we should leave." *Id.* ¶ 28. Lipkin also testified that they never yelled at George. Lipkin Dep., ECF No. 87-3, at 27.

In contrast, George testified that Lipkin "came in the office very hostile and very combative." George Dep., ECF No. 87-4, at 17. According to George, Lipkin "did not come in asking questions, [Lipkin] came in accusing the staff of not doing their job, and that they don't care about the clients, so that set the tone for the exchange, and it went downhill from there." *Id.* at 17-18. Rogsbert King, BHCare's manager of the warming center, recalls that Lipkin arrived "angry in her stance." King Dep., ECF No. 87-8, at 9. King further maintains that after engaging in a loud argument with Bobbi-Jo Evans, George sought to intervene, which caused Lipkin to become "livid with Miss Velma." *Id.* at 13. King states that Lipkin "was yelling and screaming . . . and she was saying that everyone was attacking her, she was being attacked by the staff." *Id.* at 14.

### 3.    George's Email to CS-HHC on April 5, 2022

On April 5, 2022, George drafted an email regarding her interaction with Lipkin on March 29, 2022. Pl.'s L.R. 56(a)2 St. ¶ 30. Prior to sending the email, George spoke with Jessica Arroyo, CS-HHC's Program Manager for the Homeless Division, to share that George had had a "disturbing interaction" with Lipkin. *Id.*. George told Arroyo that she wanted to send an email describing this interaction to CS-HHC. Arroyo responded that George should write

to Lipkin's direct supervisor, Phil Costello, the Medical Director of the Greater New Haven

Health Care for the Homeless Team at CS-HHC, and copy Arroyo on that message. *Id.* ¶¶ 32-

33. George wrote to Costello and Arroyo that evening; her email reads as follows:

Hello Phil and Jessica

I am writing to share an incident that occurred at the New Haven Inn Warming Center last Tuesday March 29th. It was so upsetting, I needed to take some time to process the incident.

Last Tuesday I was at the warming center meeting with the staff when Sarah Lipkin and Chloe came to the office after they met with clients. Sarah proceeded to ask the staff about the housing plan for a particular couple. The staff shared the couple's status. Sarah then stated that she was very disappointed to hear that going back to the street was the option. Sarah proceeded to accuse the staff of not doing their job. She stated that every week when she came by she saw the staff doing nothing, so she wasn't surprised that they did not have a plan for the couple. The staff told Sarah that her comments were off base and disrespectful. The staff went on to share the many unfruitful attempts that were made to engage this couple. Sarah dismissed and challenged all the alternate plans the staff presented. The staff asked for Sarah's suggestions for the couple since their options were not to her liking. Sarah had no suggestions and proceeded to accuse staff of yelling at her. At that point I interjected and said to Sarah that no one was yelling at her- they simply disagreed with her. Sarah then lashed out at me and stated that I was never there- so how could I possibly know what was going on there. She went on to say this was her first time seeing me at the motel. I told Sarah how disappointed I was with her level of disrespect and unprofessionalism. The fact that she would make such a gross generalization about the staff when she was only there for a short window of time weekly was offputting. I asked her if she was able make a patient take a medication that he/she was refusing. She said no. So I asked why would it be different for a case worker offering services that a client refused. Sarah then said she was feeling attacked and thought she should leave. We all agreed that she should leave - so she did leave.

Prior to Tuesday's incident, I had received several complaint [*sic*] from the staff about how disrespectful Sarah had been to both staff and clients. They described her as being condescending and dismissive. On Tuesday March 22, I arrived at the warming center only to find the staff scurrying around the neighborhood trying to find an elderly client who left the hotel after meeting with Sarah that day. The staff was able to find the elderly gentleman and brought him back to the motel. I met with him and asked why he left in such a haste after meeting with the nurse. He said he was very frustrated because the nurse was very mean

6

to him and dismissed his complaints. He said she would tell him she would see him the following week, he would wait for her and she would say the same thing every week. So left to catch the train to New York to get help for his frost bite. This elderly man came to the motel with frost bite to his toes and fingers and said she did nothing to address it. Sarah diagnosed this client as having scabies and ordered a treatment cream - it turns out the client had lice. The staff brought it to Sarah's attention and asked her to have him admitted to the hospital for treatment of all his medical issues. Sarah dismissed the staff's concerns so out of frustration the staff gave this client a shower, had his room professionally cleaned and reached out to the VNA for assistance. I stepped in and called Laura Daniels for help to get this elderly man assessed admitted to the hospital. Within a day Laura was able to get this elderly man admitted to the hospital as compared to two months of Sarah's delay tactics.

Phil and Jessica, as you know, the City of New Haven and Cornell Scott has enjoyed a collaborative relationship over the years. We do not always agree on issues, but we are always respectful and professional as we work through our differences. So the incident with Sarah was very disturbing as it was totally unlike the level of professionalism that I have come to expect from all staff at Cornell Scott.

I am concerned about Sarah's ability to serve our clients with dignity and her ability to work collaboratively with partner agencies.

ECF No. 87-9, at 2-3. George testified that the email was her only substantive communication to CS-HHC concerning Lipkin. George Dep., ECF No. 87-4, at 16.

On April 6, 2022, Evans submitted a separate complaint regarding Lipkin to CS-HHC. Pl.'s L.R. 56(a)2 St. ¶ 36. Evans' email is consistent with George's email. *See* ECF No. 87-10, at 2-3.

### 4.    Lipkin's Contract Is Terminated for Cause

After receiving these emails, CS-HHC placed Lipkin on paid leave and conducted an investigation. Pl.'s L.R. 56(a)2 St. ¶¶ 39, 45. During that investigation, CS-HHC leadership met with Lipkin. *Id.* ¶ 46. George has included a lengthy audio recording of that meeting among her evidentiary submissions. ECF No. 101. In the meeting, Lipkin agrees they told

7

George they had never seen George at the warming center. *Id.* (13:16). Lipkin can also be heard acknowledging that this statement "might have been not appropriate." *Id.* (13:27).

By letter dated April 21, 2022, Andrea Lobo, CS-HHC's Chief of Human Resources, informed Lipkin that their contract had been terminated for cause. *Id.* ¶ 44. Lobo stated as follows:

> Dear Sarah:
>
> I regret to inform you that your contract with the Cornell Scott Hill Health Center will not be renewed for cause. We have come to this decision based on numerous complaints from the City of New Haven Coordinator of Homelessness and the Housing and Outreach Program Manager for BHcare.
>
> While I understand that your actions that day were driven by your passion and dedication, the success of our Homeless Department, and other departments within CSHHC, depend on our ability to work collaboratively with community partners such as these. Regrettably, the conflict, strive and lack of emotional intelligence has destroyed the trust and overall relationship with both community partners. Our relationship with the city of New Haven is especially important and paramount to the success of our program. It is evident that the fit is damaged beyond repair.
>
> You will remain on payroll and benefits for 90 days until such time when your contract will officially expires [sic].
>
> I wish you well in your future endeavors.

ECF No. 87-12, at 2.

The parties dispute whether CS-HHC terminated Lipkin's contract because CS-HHC supervisors genuinely believed Lipkin had engaged in misconduct. Lobo maintains that CS-HHC's investigation substantiated the finding that Lipkin acted unprofessionally in the manner they spoke with George and BHCare employees. Lobo Dep., ECF No. 87-5, at 13. Andree notes that, beyond a brief conversation with CS-HHC's office of human resources on or about March 30, 2022, CS-HHC never conducted a follow-up interview to hear from Andree whether

Lipkin acted unprofessionally during the visit to the New Haven Inn on March 29, 2022. Andree Aff., ECF No. 93-3, ¶ 32. In his deposition, Costello (Lipkin's direct supervisor at CS-HHC) stated that Lipkin's clinical record did not provide cause to terminate Lipkin's contract. Costello Dep., ECF No. 93-5, at 4. Indeed, Costello stated that "if I had a private practice, I would hire [Lipkin] as a provider and I have no concerns with her ability to provide quality care to patients." *Id.*

### B.    Procedural History

Lipkin filed suit on February 1, 2023. Compl., ECF No. 1. Lipkin filed an Amended Complaint on May 5, 2023. Am. Compl., ECF No. 33. The Amended Complaint named two Defendants: Velma George and Cornell Scott-Hill Health Center ("CS-HHC"). *Id.* at 1. The Amended Complaint asserted four causes of action; three counts were alleged against George: (1) First Amendment retaliation, (2) defamation *per se*, and (3) tortious interference with a contractual relationship. *Id.* at 6-8. The fourth count, violation of Conn. Gen. Stat. § 31-51q, was brought against CS-HHC.

CS-HHC and George moved separately to dismiss the Amended Complaint. ECF Nos. 38, 40. The Court[5] issued two Memoranda of Decision resolving these Motions to Dismiss. On March 11, 2024, the Court granted CS-HHC's Motion to Dismiss. *Lipkin v. George*, No. 3:23-cv-127 (KAD), 2024 WL 1050358 (D. Conn. Mar. 11, 2024), ECF No. 59. On March 14, 2024, the Court denied George's Motion to Dismiss. *Lipkin v. George*, No. 3:23-cv-127 (KAD), 2024 WL 1119958 (D. Conn. Mar. 14, 2024) ("MTD Op."), ECF No. 60. After its

---

[5] The Honorable Kari A. Dooley, United States District Judge, presided over this action from July 20, 2023 to January 6, 2025, when it was transferred to me. ECF Nos. 52, 76.

Motion to Dismiss was denied, George filed an Answer to the Amended Complaint. ECF No. 86.

After completing discovery, on May 1, 2025, George moved for summary judgment. Mot. for Summ. J., ECF No. 87, Mem. of L. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), ECF No. 87-1. Lipkin timely responded in opposition on June 23, 2025. Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 94. George filed a reply brief on July 11, 2025. Reply to Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Def.'s Reply"), ECF No. 97. I heard oral argument on George's Motion on November 3, 2025. ECF No. 103; *see also* Tr. of Oral Arg. ("Tr."), ECF No. 108. Following oral argument, the parties agreed to file supplemental memoranda of law. ECF No. 104. The parties filed their supplemental memoranda on November 17, 2025. Pl.'s Supp. Mem. in Opp. to Summ. J. ("Pl.'s Supp. Mem."), ECF No. 106; Def.'s Supp. Mem. in Supp. of Summ. J. ("Def.'s Supp. Mem."), ECF No. 107.

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment must be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this

10

burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When deciding a motion for summary judgment, I may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c). In reviewing the record, I must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.     DISCUSSION

George moves for summary judgment on all of Lipkin's claims. I begin by addressing George's arguments that no triable issues remain on Lipkin's First Amendment claim before turning to the causes of action for defamation and tortious interference with contractual relations.

### A.     First Amendment Retaliation

"[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation and internal quotation marks omitted). "First Amendment retaliation claims typically arise in three distinct

11

contexts: prisoners, public employees, and criticism of public officials by private citizens." *Decker Advert. Inc. v. Delaware Cnty., New York*, 765 F. Supp. 3d 128, 141 (N.D.N.Y. 2025) (citation and internal quotation marks omitted). Any plaintiff complaining of retaliation in violation of the First Amendment must establish that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). But the First Amendment does not provide the same protections to public employees as it does to private citizens. *See, e.g.*, *Long v. Byrne*, 146 F.4th 282, 291 (2d Cir. 2025) ("When asserting a First Amendment retaliation claim, public employees . . . face greater burdens than private citizens to demonstrate that their speech is protected by the First Amendment, because '[t]he government as employer . . . has far broader powers [to restrict speech] than does the government as sovereign.'") (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006)); *see also Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 572 (1968).[6]

The parties dispute whether to classify Lipkin as a public employee. Even assuming Lipkin is properly classified as a private citizen, George argues that no reasonable jury could

---

[6] "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. "So in assessing the first prong of the retaliation test–whether a public employee's speech is protected–we must consider 'two separate subquestions': (1) whether the employee 'spoke as a citizen rather than solely as an employee,' and (2) whether he spoke on 'a matter of public concern.'" *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82–83 (2d Cir. 2022) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)). "If the employee satisfies those requirements, then the First Amendment is implicated, but more is required to establish that the Amendment protects the public employee's speech. The court must also assess whether the government employer 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Long v. Byrne*, 146 F.4th 282, 291 (2d Cir. 2025) (quoting *Lane v. Franks*, 573 U.S. 228, 242 (2014)).

find that her conduct was motivated by Lipkin's protected speech or that Lipkin was injured by George's conduct. In the alternative, George maintains she is entitled to qualified immunity. As I explain below, I find as a matter of law that Lipkin was a private citizen, not a public employee. I conclude that triable issues remain and that George is not entitled to qualified immunity at this stage of the case.

### 1.    Lipkin Was Not a Public Employee

In resolving George's Motion to Dismiss, the Court declined to treat Lipkin as a public employee because Lipkin was hired by CS-HHC, not the City of New Haven. MTD Op., 2024 WL 1119958, at *3. The Court assumed that the City of New Haven contracted with CS-HHC, but held that the contractual relationship between CS-HHC and the City of New Haven did not require the Court to apply the *Pickering-Garcetti* framework to Lipkin's First Amendment claim. *Id.* George asks me to revisit this holding, contending that Lipkin was functionally a public employee because of the relationship between CS-HHC and the City of New Haven. Def.'s Mem. 9-21.

In their briefing and at argument, the parties assumed that CS-HHC and the City of New Haven had a contract for CS-HHC to provide medical care to homeless patients at the warming center. Pl.'s Mem. 13; Def.'s Mem. 14; Tr. 4, 26. The parties stipulated that "CS-HHC provides medical care to homeless individuals and provides these services to the City of New Haven." Pl.'s L.R. 56(a)2 St. ¶ 2. But as I observed at argument, the record does not support a finding that CS-HHC was a government contractor. Tr. 3-4. George and Andrea Lobo (CS-HHC's Chief of Human Resources)—the two witnesses who could be expected to testify from personal knowledge about the relationship, contractual or otherwise, between the City and CS-HHC—explicitly declined to say that the City had a contract with CS-HHC.

13

George Dep., ECF No. 87-4, at 9;[7] Lobo Dep., ECF No. 87-5, at 7-8.[8] Indeed, George went so far as to say that the City "do[es] not fund Cornell Scott [Hill Health Corporation]." George Dep., ECF No. 87-4, at 9. Instead, these witnesses described a "partnership" between the City and CS-HHC by which CS-HHC provided healthcare services to homeless people in New Haven at facilities that received municipal funding. Lobo Dep., ECF No. 87-5, at 8.

At the close of argument, I invited the parties to supplement the record to demonstrate the existence of a contract between CS-HHC and the City and to file additional briefs on this issue. Tr. 39. The parties did not point me to any additional evidence regarding the relationship between the City and CS-HHC. Instead, in a supplemental brief, George now concedes that "the relationship [between the City of New Haven and CS-HHC] is not contractual—rather, it is a partnership pursuant to which CS-HHC provides medical services to the City's homeless with funding from various sources, including from the City." Def.'s Supp. Mem. 1. I cannot credit the statement in George's supplemental memorandum that the City partially funded CS-

---

[7] George was asked, "Now, am I correct that the city over the last several years has maintained a contract with Cornell Scott Hill Health Corporation to provide medical services to the homeless population?" ECF No. 87-4, at 9. In response, George stated: "That's not correct." *Id.* George later stated as follows: "The City of New Haven, we partner with [CS-HHC]. We do not fund [CS-HHC]." *Id.*

[8] Lobo testified as follows regarding the contractual relationship between the City and CS-HHC.

> Q. So HHC is a contractor for the City of New Haven?
> A. A contractor?
> Q. How would you describe their relationship? I don't want to put words in your mouth.
> A. We describe it as a partnership.
> Q. Okay. Does HHC provide services to the city?
> A. Correct.

ECF No. 87-5, at 7-8.

HHC because it is not supported by any evidence in the record; indeed, this statement is contradicted by George's sworn testimony that the City "do[es] not fund Cornell Scott [Hill Health Corporation]." ECF No. 87-4, at 9. In any case, because George now concedes that Lipkin's employer did not contract with the City of New Haven, I cannot say that Lipkin was a public employee.

Moreover, even looking beyond the formalities of the relationship between CS-HHC and the City, it would not be appropriate to conclude that Lipkin was functionally a public employee. As the Second Circuit has explained, *Pickering* and its progeny are predicated on the recognition that when the government "pay[s] public moneys to private individuals for services to be rendered," the government therefore obtains "a stronger interest in restricting those individuals' speech than in restricting the speech of the public at large." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 38 (2d Cir. 2018). Although some courts have treated the employees of government contractors as public employees, they have done so because the record revealed that the government as a contractor retained close control over its contractors' employees. For example, in *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011), the Ninth Circuit classified the employee of a government contractor as a public employee because the employee worked full time from a public facility, was closely supervised by public officials, and provided services going to the heart of the agency's public function. *Id.* at 1102. Similarly, in *Brink v. Bormann*, the district court held that a nurse employed by a company that contracted with the local school system was a public employee because the nurse was supervised by a school employee, worked from a school facility, and interacted regularly from

a position of trust with other school employees and students. No. CV 23-497 (ZNQ) (JTQ), 2025 WL 892980, at *4-6 (D.N.J. Mar. 24, 2025).[9]

Unlike in *Clairmont* and *Brink*, Lipkin was supervised by CS-HHC rather than by City employees. Indeed, the attenuated relationship between Lipkin and the City is demonstrated by the fact that George did not know the identity of Lipkin's supervisor. Pl.'s L.R. 56(a)2 St. ¶¶ 30-33. In contrast to the employees of contractors in *Clairmont* and *Brink* who performed their responsibilities exclusively from government facilities, here Lipkin's duties involved caring for patients in a variety of private settings. *See* Lipkin Dep., ECF No. 87-3, at 12 (stating that Lipkin "provided care as part of team to people who were living in temporary housing or were unhoused"); *see also id.* at 18 (describing visit to a soup kitchen). Indeed, George's email recognized that Lipkin spent only a "short window of time weekly" at the BHCare-operated warming center at the New Haven Inn. ECF No. 87-9, at 2. Finally, Lipkin's function as a medical provider was completely distinct from the responsibilities performed by the public employees with whom Lipkin interacted.

In conclusion, I decline to revisit the Court's holding that Lipkin was a private citizen, not a public employee. As George now concedes, Lipkin was not employed directly or indirectly by the City of New Haven. And Lipkin's employment relationship was too

---

[9] In a footnote, *Brink* cites *Hayes v. Buffalo Mun. Hous. Auth.*, No. 12-CV-578S, 2013 WL 5347544, at *4 (W.D.N.Y. Sept. 23, 2013), in support of the proposition that the *Pickering-Garcetti* framework applies to retaliation claims brought by employees of government contractors. *Brink*, 2025 WL 892980, at *5 n.2. But as Lipkin notes in their response brief, Pl.'s Mem. 13-14, *Hayes* was brought by the "owner and sole member of a construction company" that contracted with a municipal agency, *Hayes*, 2013 WL 5347544, at *1. *Hayes* therefore does not address whether the *Pickering-Garcetti* framework applies to retaliation claims brought by the *employees* of government contractors.

attenuated to classify Lipkin as a functional public employee. I therefore conclude as a matter of law that Lipkin's speech should be analyzed under the test applicable to private citizens.[10]

### 2. Issues of Fact on Lipkin's Retaliation Claim

Because I conclude that Lipkin was not a public employee, I analyze Lipkin's First Amendment retaliation claim under the framework applicable to private citizens.

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quoting *Dorsett v. Cnty. of Nassau*, 732

---

[10] George's supplemental memorandum identifies one additional argument to treat Lipkin as a public employee subject to *Pickering-Garcetti*. Given its cursory presentation, I address it only briefly. George relies on *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) ("*Brentwood I*") and *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291 (2007) ("*Brentwood II*"). In both cases, the Supreme Court analyzed the extent to which a voluntary athletic association of public and private schools could discipline a private school whose football coach had violated the association's antirecruiting rules. In *Brentwood I*, the Supreme Court held that the association, although nominally private, was in fact a state actor liable under 42 U.S.C. § 1983 because of the "pervasive entwinement of public institutions and public officials in its composition and workings." 531 U.S. at 932. In *Brentwood II*, the Court rejected the proposition that the First Amendment would otherwise prevent the association from imposing a penalty on the school because of the coach's comments. 551 U.S. at 300. In reaching that holding, the *Brentwood II* Court stated that, consistent with *Pickering-Garcetti*, the association could discipline the private school without violating the First Amendment because—even assuming the coach was speaking as a citizen on a matter of public concern—the coach's comments hazarded the "league's ability to operate 'efficiently and effectively.'" *Id.* (quoting *Garcetti*, 547 U.S. at 419).

Analogizing to *Brentwood I*, George contends that CS-HHC is a state actor because of its close relationship with the City, and that Lipkin should be considered a state actor insofar as this action implicates Lipkin's work for CS-HHC. Def.'s Supp. Mem. 2-5. But as I have observed, the record does not demonstrate that CS-HHC—let alone Lipkin—was closely entwined with public functions in a manner that would justify treating Lipkin as a public employee. In short, neither *Brentwood I* and *II* persuade me to apply *Pickering-Garcetti* to this dispute.

F.3d 157, 160 (2d Cir. 2013)). With respect to the third prong—injury—some Second Circuit decisions previously required a private citizen plaintiff to establish that "defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). As the Second Circuit has since clarified, however, "[c]hilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett*, 732 F.3d at 160. Thus, a private citizen satisfies the injury requirement by "show[ing] *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015) (quoting *Dorsett*, 732 F.3d at 160). "Allegations of loss of business or some other tangible injury as a result of a defendant's statements would suffice to establish concrete harm." *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011). In general, "retaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).

Even where all elements of a retaliation claim are established, "the defendant may rebut those allegations by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 387 (2d Cir. 2025) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Lipkin has satisfied their burden of demonstrating that at least some of their comments were protected by the First Amendment. Of course, the precise content of Lipkin's speech is sharply disputed. At minimum, the parties agree that Lipkin (1) expressed disappointment

regarding a discharge plan for Lipkin's clients; (2) Lipkin and George each accused each other of not knowing what the other was talking about with regard to the clients' needs and BHCare's ability to meet those needs; and (3) Lipkin "told Velma George that they had never observed [George] to be at the warming center before." Pl.'s L.R. 56(a)2 St. ¶¶ 17-20. George concedes that, assuming the *Pickering-Garcetti* framework does not apply, this speech was protected by the First Amendment.[11] Tr. 12.

To satisfy the second prong—whether George's email was motivated or substantially caused by Lipkin's protected expression—Lipkin must establish that George acted "with a retaliatory motive." *Vullo*, 144 F.4th at 387. George argues that her decision to send an email to Lipkin's supervisors was not caused by Lipkin's protected speech. Def.'s Mem. 19. A reasonable jury could disagree. George's email is framed as being in response to a conversation that George had with Lipkin. ECF No. 87-9, at 2. Although the parties sharply dispute the tenor of that conversation, I address the import of that dispute below. But for purposes of causation, a reasonable jury could find that George's email was substantially motivated by Lipkin's protected expression because George's email was premised on recounting her own reaction to Lipkin's concededly protected speech.

---

[11] Even absent such a concession I would conclude that the statements the parties agree Lipkin made were protected by the First Amendment. "'The First Amendment has permitted restrictions upon the content of speech in a few limited areas,' including fraud, defamation, obscenity, incitement to violence, and fighting words." *Volokh v. James*, 148 F.4th 71, 88 (2d Cir. 2025) (quoting *United States v. Stevens*, 559 U.S. 460, 468-69 (2010)). A private citizen's speech "need not have been on a matter of public concern for it to fall within the protection of the First Amendment." *Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008); *see also Friend v. Gasparino*, 61 F.4th 77, 88 (2d Cir. 2023) (reiterating that a private citizen plaintiff "does not need to establish that his speech addressed a matter of public significance in order to receive the protection of the First Amendment").

A jury could also find that George's email injured Lipkin by (1) deterring Lipkin from exercising their rights and (2) causing Lipkin to lose their position at CS-HHC.

In her email, George expressed serious "concern[] about Sarah's ability to serve our clients with dignity and her ability to work collaboratively with partner agencies." ECF No. 87-9, at 3. CS-HHC attended to George's stated concern that Lipkin was not able to collaborate with the City and its partner agencies by conducting an investigation. Following that investigation, CS-HHC explicitly invoked George's complaint as justification for their decision not to renew Lipkin's contract for cause. ECF No. 87-12, at 2. This conclusion is further supported by the testimony of Lipkin's former supervisor, who stated "if I had a private practice, I would hire [Lipkin] as a provider and I have no concerns with her ability to provide quality care to patients." Costello Decl., ECF No. 93-5, at 4. A reasonable jury could infer from these facts that CS-HHC terminated Lipkin because George conveyed that Lipkin posed a threat to the partnership between CS-HHC and the City. Indeed, even if CS-HHC did not terminate Lipkin based on the email, a reasonable jury could find the email would deter a similarly situated individual from exercising their rights. *See Decker Advert.*, 765 F. Supp. 3d at 151 (applying standard for retaliation by private citizens and observing that newspaper plausibly alleged adverse action because "other local newspapers would be deterred from participating in similar unfavorable coverage of the County out of fear that a similar directive would complicate and hinder their reporting on County activities").

Thus, a reasonable jury could conclude from this record that Lipkin has satisfied all elements of a First Amendment retaliation claim by a private citizen.

I conclude by discussing one affirmative defense identified but not yet analyzed by the parties. In *Mount Healthy*, the Supreme Court articulated an affirmative defense to First

Amendment retaliation claims. 429 U.S. at 287. "Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event . . . once the employee has established a prima facie case, the employer may still be entitled to summary judgment based on the *Mount Healthy* defense by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015) (citation and internal quotation marks omitted); *Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 32 (2d Cir. 1996) (describing the *Mount Healthy* defense as tantamount to the "hypothetical question, 'Would the defendant have taken the same adverse action even if the impermissible reason had not existed?'"); *see also Vullo*, 144 F.4th at 387 (observing that *Mount Healthy* balances government interests "against the need to uphold robust constitutional protections"). "[A]lthough the language in *Mt. Healthy* refers to the plaintiff's protected conduct, the Court's analysis, properly understood, attempts to weigh the impact of the defendant's impermissible reason on the defendant's decision to act." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 120 (2d Cir. 2011). "[D]efendants asserting a *Mount Healthy* defense may not rely solely on the occurrence of unprotected misconduct: they must also articulate and substantiate a reasonable link between that misconduct and their *specific* adverse actions." *Smith*, 776 F.3d at 123 (emphasis in the original).

*Mount Healthy* offers a helpful framework for analyzing George's suggestion that she took an adverse action against Lipkin not because of Lipkin's protected expression but because of Lipkin's purportedly disruptive or inappropriate conduct. But George's briefing is silent on this issue, and counsel presented this argument only in response to my questions at oral

argument. Tr. 18. George does not analyze, under the standard applicable to private citizen speech, which of Lipkin's statements or actions are entitled to constitutional protection and what forms of alleged misconduct or speech are not protected by the First Amendment. For example, there has been no adversary presentation on the issue of whether, if Lipkin indeed screamed and yelled at George and BHCare staff, such conduct by a private citizen is protected by the First Amendment. Beyond further legal analysis, the *Mount Healthy* defense turns on disputed issues of fact, including the tone, tenor, and content of the interaction between Lipkin, George, and BHCare staff. Indeed, a rational jury could conclude from evidence in the record that Lipkin reacted calmly and professionally to outbursts from George and BHCare staff. ECF No. 87-3, at 27 (Lipkin testifying they did not yell at George); Andree Decl. ¶¶ 20, 26, 29.[12] If a jury accepted Lipkin's and Andree's account of events, the jury could permissibly find that George's email overstated concerns around Lipkin's "unprofessional" behavior in retaliation for Lipkin's criticism regarding the treatment of RD and G and the statement that Lipkin had never seen George at the warming center before.

In short, I cannot resolve from this record whether a *Mount Healthy* defense entitles George to judgment as a matter of law. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 558 (2d Cir. 2001) ("Both sides' arguments rest heavily on

---

[12] George's reply brief states that "Andree's affidavit, . . . consisting primarily of Andree's impression of the exchange, does not raise disputed issues of material fact relevant to this Court's resolution of the motion." Def.'s Reply 3-4. At argument, counsel argued for the first time that Andree's affidavit should be disregarded because it "is hearsay upon hearsay" insofar as it relates to matters of which Andree lacks personal knowledge. Tr. 38. Although counsel suggested that the reply brief set forth George's objection to the evidentiary value of the Andree affidavit, Tr. 39, the reply brief contains no such objection, *see* Def.'s Reply 3-4. Moreover, it is not clear why Andree, who was present at the meeting, cannot describe Lipkin's conduct at the meeting. In any event, because George has not sufficiently articulated an objection to the Andree affidavit, I can rely on it for the purposes of this motion.

the proper characterization of plaintiffs' speech and defendants' motives. Making these determinations correctly depends on an evaluation of conflicting testimonial evidence, which a factfinder is in the best position to evaluate.").

### 3.    Qualified Immunity

Without conceding liability on the First Amendment retaliation claim, George nonetheless asserts she is entitled to qualified immunity. Def.'s Mem. 21-23.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (citations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). "To determine whether an official is entitled to qualified immunity, we consider (1) 'whether the facts that a plaintiff has shown make out a violation of a constitutional right,' and (2) 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Matusak v. Daminski*, 165 F.4th 702, 711 (2d Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (alterations adopted). Because I have concluded that a reasonable jury could find that George violated Lipkin's First Amendment rights, George "is entitled to qualified immunity only if the rights at issue in this case were not 'clearly established' at the time of her challenged conduct." *Vullo*, 144 F.4th at 389.

"To be sure, a case directly on point is not required for a right to be clearly established." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (citation and internal quotation marks omitted). "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing

23

violates that right." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025) (internal quotation marks omitted). "In determining if a right is clearly established," the Second Circuit has instructed that I should analyze "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022) (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). In conducting this analysis, I construe all factual disputes in Lipkin's favor. *See Eaton*, 144 F.4th at 94; *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022) ("Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff— are to be determined by the factfinder.").

George's primary argument is that she is qualifiedly immune because it is not clearly established how to analyze retaliation claims brought by the "employee of a municipal contractor." Def.'s Mem. 22. But as described above, CS-HHC was not a municipal contractor. Because Lipkin's employer cannot be classified as a government contractor, any uncertainty in how to analyze such claims—if such uncertainty indeed exists—does not bear on whether George is entitled to qualified immunity.

Indeed, resolving all disputed factual issues and drawing all inferences in Lipkin's favor, it is plain that clearly established law imposed liability in these circumstances. The Court rejected George's qualified immunity argument at the motion-to-dismiss stage, observing that a "government official's retaliation against a private citizen for engaging in constitutionally protected speech is an infringement of the First Amendment right." MTD Op., 2024 WL 1119958, at *6. At summary judgment, George does not make any attempt to meet her burden to distinguish this record—viewed in the light most favorable to Lipkin—from the long line

24

of authority establishing that a public official cannot retaliate against a private citizen on account of the citizen's protected expression.[13] *See, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."); *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996) (reiterating that First Amendment permits adverse employment action only when the protected speech disrupts workplace); *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 153-54 (2d Cir. 2006) (holding that employees of a regulatory agency can be liable under the First Amendment for retaliating against a regulated entity); *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 545 (2d Cir. 2014) (holding that plaintiff's "right[] to be free from retaliation" following protected speech was clearly established); *see also Clark v. Boughton*, No. 3:21-CV-1372 (SRU), 2022 WL 4778582, at *16 (D. Conn. Oct. 3, 2022) (collecting cases in support of the proposition that the "rights to criticize a public official, and to be free from retaliation for doing so, have long been protected by the First Amendment").

Moreover, in the First Amendment context, the Second Circuit has recognized that qualified immunity is not available where (1) "specific intent of a defendant is an element of plaintiff's claim under clearly established law" and (2) a "plaintiff has adduced sufficient

---

[13] As the Second Circuit recently explained, George's argument here—that qualified immunity attaches "because the relevant caselaw, persuasive as it may be, does not clearly bar the challenged conduct"—requires courts to confront "the difficult question of whether the relevant factual circumstances are truly 'novel' under existing precedent." *Vullo*, 144 F.4th at 390. George's briefing does not confront the "difficult question" of identifying how competent evidence in the record renders this case "truly novel."

evidence of that intent to defeat summary judgment." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996) (stating that qualified immunity is unavailable where a plaintiff shows "particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive"); *see also Davi v. Guinn*, No. 16-CV-5060 (ERK) (PK), 2024 WL 2746940 (E.D.N.Y. May 29, 2024), at *11-12 (stating that in the First Amendment retaliation context, "qualified immunity does not apply where there is evidence that the defendants' actual motive was to retaliate against the employee's speech rather than due to a concern about disruption"). Thus, qualified immunity should not be granted on a First Amendment retaliation claim where a plaintiff has presented evidence of a defendant's retaliatory animus. *Cecchini v. Schenck*, No. 3:14-CV-1704 (MPS), 2017 WL 902849, at *16 (D. Conn. Mar. 7, 2017) (observing that qualified immunity was not appropriate "[b]ecause the central issue here is the causal connection, i.e., retaliatory animus").

George's motive in writing her email—whether she wrote to Lipkin's supervisors to retaliate for Lipkin's protected conduct or, as George maintains, to address Lipkin's inappropriate and unprotected workplace conduct—is a required element of Lipkin's retaliation claim. And, as noted throughout this opinion, Lipkin has adduced sufficient evidence to create a triable issue of George's motive. To wit: the record includes evidence from which a jury could reasonably find that George's email contained information that George knew was untrue, which would support the inference that George sent the email with the intent of retaliating for Lipkin's protected expression. I therefore conclude from this record that George is not entitled to summary judgment on Lipkin's First Amendment claim.

## B.      State Law Claims

George also seeks judgment as a matter of law on Lipkin's state law claims of defamation *per se* and tortious interference with contractual relations. I conclude that triable issues remain as to each claim.

### 1.      Defamation *Per Se*

Lipkin asserts that George is liable for defamation *per se* by making false statements to Lipkin's supervisors at CS-HHC that injured Lipkin's professional reputation. Am. Compl. 7. George argues that the defamation claim fails as a matter of law because George was merely expressing her opinion of Lipkin rather than purporting to assert objective facts. Def.'s Mem. 25-27.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. But it is not enough that the statement inflicts reputational harm. To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *NetScout Systems, Inc. v. Gartner, Inc.*, 334 Conn. 396, 410 (2020) (citations and internal quotation marks omitted). The Connecticut Supreme Court has identified several factors a court should consider in analyzing whether a statement expressed an opinion or instead purported to convey an objective fact. These include "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Id.* at 413 (citation omitted). Even if the distinction between fact and opinion can be "somewhat nebulous," the Connecticut

Supreme Court has emphasized that the lodestar should be "whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 112 (1982) (citation and internal quotation marks omitted).

Lipkin's briefing identifies several statements within George's April 5 email that I agree expressed facts rather than opinions. Pl.'s Mem. 17-18. For example, George's email reported that "Sarah proceeded to accuse the staff [at BHCare] of not doing their job. She stated that every week when she came by she saw the staff doing nothing, so she wasn't surprised that they did not have a plan for the couple." ECF No. 87-9, at 2. George also wrote that, before the argument on March 29, 2022, "I had received several complaint[s] from the staff about how disrespectful Sarah had been to both staff and clients." *Id.* George also reported that Lipkin had responded dismissively and engaged in "delay tactics" rather than attending to the needs of an elderly patient. *Id.* at 2-3.

Each of these statements conveyed objective, falsifiable facts. I therefore agree that these statements properly form the basis of a defamation claim. George's motion for summary judgment as to the defamation claim is accordingly denied.

## 2.    Interference with Contractual Relations

Lipkin asserts that George tortiously interfered with Lipkin's contractual employment relationship. Am. Compl. 7.

"A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4)

28

that the interference was tortious; and (5) [that there was] a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Sackman v. Quinlan*, 198 Conn. App. 614, 628 (2020) (citation omitted).

George contends that Lipkin cannot satisfy the third, fourth, and fifth elements. Def.'s Mem. 29-30. I disagree. Resolving all factual disputes in Lipkin's favor, a reasonable jury could conclude from George's email that George published false statements with the intent of causing Lipkin to lose their job at CS-HHC. Although George suggests her goal was not for Lipkin to lose their job and testified that she wrote to CS-HHC "in hopes that we could sit down and talk," ECF No. 87-4, at 20, the jury could infer otherwise because George's email never requested a meeting. Moreover, a jury could conclude from the record that George interfered tortiously insofar as her email included false statements about Lipkin's professionalism and medical skill.

Finally, a jury could permissibly find that this interference caused Lipkin's employer to terminate Lipkin's contract for cause.

### 3.    Qualified Privilege

Without conceding liability as to the state law claims, George argues her statements are subject to the qualified privilege for statements made in the bona fide discharge of the employee's official duties. Def.'s Mem. 30-33.

"When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. The first is whether the privilege applies, which is a question of law . . . . The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact." *Khan v. Yale Univ.*, 347 Conn. 1, 49 (2023) (citation and internal quotation marks omitted). "To establish a qualified privilege

defense, a defendant must prove five elements: '(1) an interest to be upheld, (2) a statement limited in scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only.'" *Cox v. Galazin*, 460 F. Supp. 2d 380, 390 (D. Conn. 2006) (quoting *Miles v. Perry*, 11 Conn. App. 584, 595 (1987)). "As a general matter, a qualified privilege in a defamation case may be defeated if it can be established that the holder of the privilege acted with malice in publishing the defamatory material." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009). "[M]alice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." *Id.* at 630 (quoting *Bleich v. Ortiz*, 196 Conn. 498, 504 (1985)). The "qualified privilege is lost upon a showing of *either* actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, *or* malice in fact, i.e., publication of a false statement with bad faith or improper motive." *Gambardella*, 291 Conn. at 630 (emphasis in original).

Resolving all disputed issues of fact and drawing all inferences in Lipkin's favor, and assuming for the sake of argument that the privilege applies, I nonetheless decline to apply the privilege because I conclude that a reasonable trier of fact could conclude that George made her statements with malice. That is, a jury could conclude that George acted with actual malice in sending an email that she knew or should have known contained false statements concerning Lipkin's professionalism. As material issues of fact remain on the applicability of the qualified privilege, George's motion for summary judgment as to both state law claims is denied.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant Velma George's Motion for Summary Judgment is denied. The court will convene the parties for a scheduling conference to set deadlines for

trial submissions and to query the parties' interest in a referral to a United States Magistrate

Judge to conduct a settlement conference.

**SO ORDERED.**


New Haven, Connecticut
March 31, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

31